Richard L. FEINSTEIN, et al., Plaintiffs,

v.

The FIRESTONE TIRE AND RUBBER CO., Defendant.

Irving KANTER, etc., Plaintiff,

v.

FIRESTONE TIRE AND RUBBER CO., Defendant.

Mary JACKS and Eileen Miller, etc., Plaintiffs,

v.

FIRESTONE TIRE AND RUBBER CO., INC., Defendant.

Nos. 78 Civ. 4342–CSH, 78 Civ. 4301–CSH and 80 Civ. 2339–CSH.

United States District Court, S. D. New York.

March 30, 1982.

Gene Mesh Co., L. P. A., Cincinnati, Ohio, Guren, Merritt, Sogg & Cohen, Cleveland, Ohio, for Jacks plaintiffs; Gene Mesh, Cincinnati, Ohio, David Schaefer, Cleveland, Ohio, of counsel.

Townley & Updike, New York City, Jones Day, Reavis & Pogue, Cleveland, Ohio, for defendant The Firestone Tire & Rubber Co.; James K. Leader, New York City, Patrick F. McCartan, John L. Strauch, Robert R. Weller, John W. Edwards, II, Cleveland, Ohio, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiffs in the three captioned actions move for class certification under Rule 23, F.R.Civ.P. The defendant in each case is The Firestone Tire & Rubber Company ("Firestone"). The cases arise out of a series of failures of Firestone-manufactured steel belted radial tires, which in 1978 prompted reports by the National Highway Traffic Safety Administration ("NHTSA") and the Committee on Interstate and Foreign Commerce of the United States House of Representatives. In response to the NHTSA report, Firestone entered into a voluntary recall program of the tires in question. Alleged defects in Firestone tires have also spawned numerous specific actions for death, injury or damage; and, as in the three cases at bar, more far-reaching, putative class actions, based upon various theories of recovery.

Firestone contends that none of the captioned cases is appropriate for class certification under Rule 23, the pertinent provisions of which appear in the margin.[1]

Kass, Goodkind, Wechsler & Gerstein, New York City, for Feinstein plaintiffs; Stuart D. Wechsler, Robert S. Schachter, Samuel K. Rosen, Jonathan M. Plasse, New York City, of counsel.

David Jaroslawicz and Greenfield & Schoen, P. C., New York City, for Kanter plaintiffs.

1. The rule provides:

"(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

"(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

"(1) the prosecution of separate actions by or against individual members of the class would create a risk of

"(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

## I.

The three actions now pending in this Court may be summarized as follows:

1. *The Feinstein Action.* The Feinstein action was commenced in this Court in 1978. The named plaintiffs' amended complaint seeks to certify a class of persons and entities who:

"... (a) owned Firestone 500 steel belted radial tires ('Firestone 500's') manufactured by defendant, The Firestone Tire & Rubber Company ('Firestone') commencing with the date of the applicable statute of limitations and terminating with entry of judgment herein (the 'Class Period'); and (b) owned Firestone TPC steel belted radial tires ('TPC's') commencing with the date of the applicable statute of limitations and terminating with entry of judgment herein."

Jurisdiction is asserted under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*,[2] and under principles of state statutory

"(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
"(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

2. The Act, after defining certain terms which appear in its text, 15 U.S.C. § 2301, sets forth detailed rules governing the contents, designation, minimum standards, and other provisions relating to warranties and service contracts of consumer products moving in commerce. The jurisdictional provisions applicable to the case at bar appear in § 2310(d) and (e), which read:

"(d)(1) Subject to subsections (a)(3) and (e) of this section, a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief—
"(A) in any court of competent jurisdiction in any State or the District of Columbia; or
"(B) in an appropriate district court of the United States, subject to paragraph (3) of this subsection....
"(3) No claim shall be cognizable in a suit brought under paragraph (1)(B) of this subsection—
"(A) if the amount in controversy of any individual claim is less than the sum or value of $25;
"(B) If the amount in controversy is less than the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit; or
"(C) if the action is brought as a class action, and the number of named plaintiffs is less than one hundred.
"(e) No action (other than a class action or an action respecting a warranty to which subsection (a)(3) of this section applies) may be brought under subsection (d) of this section for failure to comply with any obligation under any written or implied warranty or service contract, and a class of consumers may not proceed in a class action under such subsection with respect to such a failure except to the extent the court determines necessary to establish the representative capacity of the named plaintiffs, unless the person obligated under the warranty or service contract is afforded a reasonable opportunity to cure such failure to comply. In the case of such a class action (other than a class action respecting a warranty to which subsection (a)(3) of this section applies) brought under subsection (d) of this section for breach of any written or implied warranty or service contract, such reasonable opportunity will be afforded by the named plaintiffs and they shall at that time notify the defendant that they are acting on behalf of the class. In the case of such a class action which is brought in a district court of the United States, the representative capacity of the named plaintiffs shall be established in the application of rule 23 of the Federal Rules of Civil Procedure."

A definition of particular significance to the case at bar appears at § 2301(7):
"The term 'implied warranty' means an implied warranty arising under State law (as modified by sections 2308 and 2304(a) of this

and common law. Firestone asserts, and plaintiffs do not dispute, that such a class would cover approximately 43,000,000 tires and approximately 12,000,000 or more putative class members. During the course of preliminary hearings in the case, counsel for the *Feinstein* plaintiffs have narrowed the claims asserted on behalf of the class to claims for breach of an implied warranty of merchantability under the Uniform Commercial Code, §§ 2–314 and 2–714.[3] That is to say, the putative *Feinstein* class members assert no claims for death, injury or accident-related property damage resulting from their use of Firestone tires. The claims of this class are limited to claims for "economic damages" arising out of the cited sections of the UCC, and for punitive damages.

2. *The Kanter Action.* The *Kanter* action was originally filed in the Supreme Court of the State of New York, New York County. Firestone removed the action here. Kanter's complaint originally sought class certification under Article 9 of the NYCPLR; having been removed to this Court, he now invokes Rule 23. Kanter seeks certification as representative of a class consisting of individuals and entities "who are residents of the State of New York and purchased Radial 500's between December 1, 1975 and January 1, 1978," the class to include "persons who purchased such tires as original equipment on their automobiles or as replacement tires." Firestone asserts, and the plaintiff Kanter does not deny, that this class would include 574,000 tires and 160,000 putative class members. The theories of liability asserted in *Kanter* include, in addition to breach of the implied warranty of merchantability, strict liability in tort, negligence, reckless disregard, fraud and deceit. The complaint in *Kanter* prays for "the amount of actual damages sustained by plaintiff and each member of the class"; "a recall of all Radial 500 tires sold to residents of New York which are still in use"; and "the replacement on a fairly adjusted basis of all Radial 500 tires which are recalled with steel-belted radial tires which are safe and free of defects or the equivalent in dollars."

3. *The Jacks Action.* The *Jacks* action was originally commenced in the United States District Court for the Northern District of Ohio, Eastern Division. That court (William K. Thomas, District Judge) granted Firestone's motion under 28 U.S.C.

title) in connection with the sale by a supplier of a consumer product."

**3.** U.C.C. § 2–314 provides:

"(1) Unless excluded or modified (Section 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

"(2) Goods to be merchantable must be at least such as

"(a) pass without objection in the trade under the contract description; and

"(b) in the case of fungible goods, are of fair average quality within the description; and

"(c) are fit for the ordinary purposes for which such goods are used; and

"(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

"(e) are adequately contained, packaged, and labeled as the agreement may require; and

"(f) conform to the promises or affirmations of fact made on the container or label if any.

"(3) Unless excluded or modified (Section 2–316) other implied warranties may arise from course of dealing or usage of trade."

U.C.C. § 2–714 provides:

"(1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2–607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

"(3) In a proper case any incidental and consequential damages under the next section may also be recovered."

These quotations are from the U.C.C. as enacted in New York State, effective September 27, 1964. 62½ McKinney's Consol.Laws of N.Y. (1964).

§ 1404(a) to transfer the case to this Court for consolidation with *Feinstein*. The named plaintiffs in *Jacks*, also invoking the Magnuson-Moss Warranty Act and Ohio law, seek to certify a class which:

"... consists of all purchasers of Firestone Steel belted radial automobile tires (hereinafter 'Radial'), or their equivalent sold under another name, including persons who purchased said tires as original equipment on new cars or from third party vendors under private label."

Firestone alleges, and the *Jacks* plaintiffs do not dispute, that such a class would include approximately 47,000,000 tires and approximately 13,700,000 or more persons. The amended complaint asks that the conduct of Firestone be found violative of the Magnuson-Moss Warranty Act, and that its actions also be condemned as constituting "common law fraud," as well as in violation of Ohio law "and similar laws of other states." Plaintiffs in *Jacks* demand alternative compensation to all members of the class as follows:

"(i) To require a return of said tires and recover the original purchase price.

"(ii) To require a return of said tires and acceptance of a new non-defective tires.

"(iii) To require the payment of money damages for actual and consequential damages incurred.

"(iv) To require the payment of punitive damages in the amount of $10,000.00 for each purchaser of said tires."

The *Jacks* plaintiffs also request preliminary and permanent injunctive relief in respect of further sales of defective tires and disclosure of existing defects.

The appropriateness of these actions for class certification under Rule 23 are considered *seriatim*, and in the order summarized above.

## II.

### Class Certification of the Feinstein Action

■ Before a class action may be maintained under Rule 23, the action must meet the prerequisites of Rule 23(a), and one set of the alternative requirements of Rule 23(b).[4]

■ Of the four specified Rule 23(a) prerequisites, usually identified by the shorthand names "numerosity," "commonality," "typicality" and "adequacy," Firestone concedes only numerosity, and contests the others. In addition to these specific Rule 23(a) requirements, the courts have implied two others: (1) there must be an identifiable class, and (2) the class representatives must be members of that class. 7 Wright and Miller, Federal Practice and Procedure (1972), §§ 1760, 1761 at 579–592. Firestone challenges the presence of both factors. Finally, if the class is certifiable only under Rule 23(b)(3), it must appear (1) that questions of law or fact common to class members predominate over questions affecting only individual members, and (2) that a class action "is superior to other available methods for the fair and efficient adjudication of the controversy." Firestone contends that the *Feinstein* class is arguably certifiable only under Rule 23(b)(3), and that neither of these two additional requirements is shown. The burden of persuasion on all disputed issues falls on plaintiffs, as the proponents of class certification. *Greeley v. KLM Royal Dutch Airlines*, 85 F.R.D. 697 (S.D.N.Y.1980).

■ I hold that this case may be certified, if at all, only under Rule 23(b)(3).[5]

---

**4.** *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 163, 94 S.Ct. 2140, 2145, 40 L.Ed.2d 732 (1974). These requirements are not avoided by invocation of the Magnuson-Moss Act; a Magnuson-Moss plaintiff seeking class certification must satisfy the Rule 23 criteria and also "the *additional* factors of § 2310(d)(3) ... before the action can proceed in federal court rather than state court." *Barr v. General Motors Corp.*, 80 F.R.D. 136, 139 n.5 (S.D.Ohio 1978).

**5.** Rule 23(b)(1)(A) is designed to prevent situations in which different courts would establish "incompatible standards of conduct" for the party opposing class certification. The main thrust of the case at bar is to recover money damages for class members, not to regulate Firestone's conduct. The only effect of inconsistent decisions would be the payment of damages to some claimants but not to others, an inadequate basis for Rule 23(b)(1)(A) certification. Miller, *An Overview of Federal Class*

That being so, one of the decisive issues is whether common questions of law or fact "predominate" over individual questions. Firestone vigorously attacks certification on that ground.

■ It is necessary to analyze the nature of the putative class's claims, and the proof that would be adduced in support of them. While recitation in the complaint of common questions of fact or law may satisfy bare pleading requirements, when a motion for certification is made the Court must look beyond the labels employed, and, on the basis of the record developed since filing, determine whether it is in fact confronted with a legitimate class action.[6]

As noted *supra*, the *Feinstein* plaintiffs now limit their claims and that of the putative class to claims of economic damage arising out of breach of implied warranties under U.C.C. §§ 2–314 and 2–714. Section 2–314 establishes the basis of liability. Under its terms, "a warranty that the goods shall be merchantable is implied in a contract for their sale"; to be merchantable, the goods "must be at least such as . . . (c) are fit for the ordinary purposes for which such goods are used." If the buyer proves a breach of implied warranty of merchantability, § 2–714 comes into play, and provides *inter alia* that "[t]he measure of damages is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted . . . ." § 2–714(2). The *Feinstein* plaintiffs'

substantive allegations of fault (amended complaint, ¶¶ 155, 156) read as follows:

"155. In connection with manufacture and sales of the Firestone 500's and Firestone TPC's, Firestone warranted that the tires were of merchantable quality and were fit for the purpose intended, including their mounting upon an automobile for use by the plaintiffs and the Class.

"156. Firestone 500's and Firestone TPC's are not of merchantable quality and are not fit for the use intended. Upon information and belief, as a result of their defective conditions, the plaintiffs and the Class have suffered or will suffer blowouts, tread separation and chunking, steel belt separation, or shifting, bead distortion, sidewall blisters and cracks, and out of round conditions."

Damages are prayed for "in an amount to be determined at trial"; plaintiffs' briefs make it clear that they claim economic damages accruing at the time they purchased their tires, as measured generally by § 2–714(2).

Firestone offers credible evidence that during the years in question "the great majority" of types of tires in suit "remained failure free throughout the time they were used," meeting or exceeding the maximum express treadwear mileage guarantee of 40,000 miles.[7] Indeed, certain plaintiffs whose depositions have been taken acknowledge that their Firestone tires led full and uneventful lives. Plaintiffs do not dispute this evidence. I am, therefore, led to

---

*Actions: Past, Present and Future* at 43 (1977). Rule 23(b)(1)(B) contemplates possible adverse effects upon class members, rather than upon the opposing party; examples are claims by numerous persons against an insufficient fund, or the effects of a negative or mandatory injunction upon the opposing party. See Supplementary Note of Advisory Committee Covering 1966 Amendment to Rule, following 28 U.S. C.A. Rules 22 to 23.2 (1981) at 53. Such factors are not present here. Rule 23(b)(2) does not apply to cases such as the one at bar, where the relief requested runs predominantly to money damages. *Id.* at 54.

The *Feinstein* plaintiffs' assertion of their intent to prove a "common defect" in the Firestone tires does not change this analysis. *Cf. In re Agent Orange Liability Litigation*, 506 F.Supp.

762, 789–90 (E.D.N.Y.), *reversed on other grounds*, 635 F.2d 987 (2d Cir. 1980) (class action on behalf of Vietnam veterans and their families alleging damages from exposure to dangerous herbicide held certifiable only under Rule 23(b)(3)).

6. *Clark v. Thompson*, 206 F.Supp. 539 (D.C. Miss.1962), *aff'd*, 313 F.2d 637 (5th Cir.), *cert. denied*, 375 U.S. 951, 84 S.Ct. 440, 11 L.Ed.2d 312 (1963); *Hauck v. Xerox Corp.*, 78 F.R.D. 375, 377 (E.D.Pa.1978); *Colburn v. Roto-Rooter Corp.*, 78 F.R.D. 679, 681 (N.D.Cal.1978).

7. Affidavit of Anthony J. DiMaggio, a Firestone executive in a position to testify on the point, at ¶ 9.

conclude that in respect of the considerable majority of Firestone tires covered by this litigation, the "rubber met the road" and continued to do so, without incident, during their predicted lives of service.

■ That raises the question of whether the owners of such tires have suffered any damages. Plaintiffs say they have. They claim that all Firestone tires contained common defects; and their damage theory is stated succinctly in their reply brief at 26: "... the Feinstein plaintiffs' claim is that the purchase of a defective tire, *ipso facto*, caused economic loss."

No persuasive authority is cited for that proposition, and I reject it. Tires which lived full, productive lives were, by demonstration and definition, "fit for the ordinary purposes" for which they were used; hence they were "merchantable" under U.C.C. § 2–314, and no cause of action for breach of an implied warranty can arise. This is quite basic; as comment 13 to § 2–314 observes:

> "In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained."

■ Plaintiffs' cause of action based upon the Magnuson-Moss Act does not change this result. 15 U.S.C. § 2310(d)(1) extends the Act to a consumer "who is *damaged* by the failure" to comply, *inter alia*, with an implied warranty (emphasis added). Liability does not exist in a vacuum; there must be a showing of *some* damage, which then may lead to further issues of *quantum*. Judge McGarr, certifying a class action under Magnuson-Moss in *In re General Motors Corporation Engine Interchange Litigation*, MDL Docket No. 308 (N.D.Ill. Oct. 13, 1977), articulated that distinction at slip op. 7:

"The court is convinced that the issues of liability and *the fact of damage* can be tried separately from the issues involved in determination of individual damages. Therefore, the class is certified for the purpose of establishing liability only." (emphasis added).

In the case at bar, I hold that tire owners whose tires performed to their entire satisfaction cannot demonstrate, as a matter of law, the "fact of damage" necessary to state a claim under Magnuson-Moss.[8]

The principle is further illustrated by *Skelton v. General Motors Corp.*, 500 F.Supp. 1181, 1191–92 (N.D.Ill.1980), *reversed on other grounds*, 660 F.2d 311 (7th Cir. 1981). Plaintiffs, purchasers of automobiles manufactured by defendant General Motors, sought to bring a nationwide class action under Magnuson-Moss on behalf of all purchasers of GM automobiles manufactured from 1976 through 1979. Plaintiffs asserted that brochures, manuals, consumer advertising, and other publications warranted and represented that the cars contained "THM 350 (M38) transmissions," which "would meet a specified level of performance," but that GM had made an undisclosed substitution of an inferior THM 200 transmission. This was alleged to constitute, *inter alia*, the breach of an implied warranty under Magnuson-Moss. The district court, looking "to state law to determine the scope of implied warranties" under § 2301(7) of the Act, 500 F.Supp. at 1191, arrived (as do the present plaintiffs) at U.C.C. § 2–314. The court posed the question as follows:

"The implied warranty of merchantability does not impose a general requirement that goods precisely fulfill the expectations of the buyer. Instead, it provides for a minimum level of quality—that the goods 'are fit for the ordinary purposes for which such goods are used.' U.C.C. § 2–314(2)(c). Automobiles are designed

---

8. Furthermore, since the *Feinstein* plaintiffs limit their claims to breaches of an implied warranty, and the Act, § 2301(7), defines that term as "an implied warranty arising under State law," we are in any event thrown back to the U.C.C. as enacted by the several states, thereby returning to square one. *Novosel v. Northway Motor Car Corp.*, 460 F.Supp. 541, 545 (N.D.N.Y.1978).

for driving, and therefore the question in this case is whether the GM vehicles at issue were fit for that purpose." *Ibid.* After reviewing Illinois interpretations of the Code, the court in *Skelton* answered that question in the affirmative:

> "The complaint here describes a less extreme situation. The plaintiffs allege that the substitution of THM 200 transmissions was 'a material change' in the cars, and that these transmissions are 'more expensive to maintain' and 'less desirable to the purchasing public than THM 350 (M38) Transmissions.' Second Amended Complaint at 5. These statements fall short of alleging a breach of implied warranties, since they do not suggest that the cars were unfit for driving or below a minimally acceptable standard of quality." *Id.* at 1192.

The case at bar does not turn on the adequacy of plaintiffs' pleading, but rather upon the actual performance of Firestone's tires, as revealed by the record developed between filing the complaint and moving for certification. The majority of the tires sold to putative class members, by doing what they were supposed to do for as long as they were supposed to do it, clearly lived up to that "minimum level of quality"

which is all U.C.C. § 2–314(2)(c) requires. Thus no claim for breach of an implied warranty is maintainable in respect of such tires. Plaintiffs' bald assertion that a "common" defect *which never manifests itself "ipso facto* caused economic loss" and breach of implied warranty is simply not the law.

Since it appears that the majority of the putative class members have no legally recognizable claim,[9] the action necessarily metastasizes into millions of individual claims. That metastasis is fatal to a showing of predominance of common questions. Those class members whose tires had performed as warranted would have to be identified and eliminated from the action. Myriad questions would confront the survivors, including the manner in which the alleged breach of warranty manifested itself, and other possible causes of the problem encountered.[10] This situation simply does not lend itself to class treatment.

I hold that view, even accepting *arguendo* plaintiffs' assertion that they can prove "common defects" in Firestone tires.[11] Within the context of a suit for breach of implied warranty a "defect" is of legal significance only if it renders a tire unfit for

---

**9.** I do not overlook the plaintiffs' claims for punitive damages. But I am cited to no authority supporting a claim for punitive damages in the absence of proof of an actionable breach of implied warranty. *Novosel v. Northway Motor Car Corp., supra,* an action brought under Magnuson-Moss, construed the U.C.C. as enacted in New York to exclude a claim for punitive damages even where a breach of an implied warranty is proved. 460 F.Supp. at 545. Where no breach is shown, this would seem to follow *a fortiori.* In *Engine Interchange* the Seventh Circuit, considering the adequacy of a proposed settlement, and after an extended footnote discussion, left open the question of whether "an award of punitive damages is appropriate under the Magnuson-Moss Act," 594 F.2d at 1133 n.44. While earlier in the same footnote the Seventh Circuit expressed its disagreement with GM that "punitive damages are never recoverable under federal law unless expressly authorized," it added that "it is not unlikely that Congress intended to provide at least the same relief available under state law for breach of warranty." This does not suggest a perceived intention to provide *greater* relief than state law would provide, *i.e.,* an award of puni-

tive damages for breach of implied warranties. In any event, the discussion of punitive damages in *Engine Interchange* clearly contemplates a predicate breach of warranty; in the case at bar, no breach is demonstrable as to the majority of the Firestone tires.

**10.** Negligence in the manufacture of a tire cannot be inferred from the fact of a blow-out standing alone. See, *e.g., Goodyear Tire & Rubber Co. v. Hughes Supply, Inc.,* 358 So.2d 1339, 1342 (Fla.1978).

**11.** An affidavit of plaintiff's counsel states that discovery to date "demonstrates the existence of common defects during the history of the production of Firestone 500's and TPC's," those defects being "related in part to problems associated with the steel belts." Schacter affidavit at ¶¶ 4, 5. A subsequent affidavit of an expert witness expresses the opinion "that the Firestone tires share a common design defect relating to the failure of the steel cords to adhere to the surrounding skim stock." Edwards affidavit at ¶ 5.

its ordinary purpose; and the undisputed evidence of actual performance is that the majority of the Firestone tires, whatever their imperfections may have been, did not have defects making them unfit for their intended use. I am quite prepared to judicially notice the *facts* of NHSTA and Congressional concern, if not the contents of their reports; and to infer from that concern that an unusual and worrying number of Firestone tires failed. But most did not. Neither the fact of governmental concern nor plaintiffs' allegations of "common defects" can transform this litigation, involving millions of purchasers of millions of tires, into an action where common questions of fact or law predominate.

Throughout their briefs plaintiffs rely upon *In re General Motors Corporation Engineer Interchange Litigation, supra*, and *In re Agent Orange Product Liability Litigation, supra*, where classes were certified. These cases are very different, and the differences serve to highlight the difficulties inherent in the present case.

The *Engineer Interchange* litigation arose out of General Motors' decision to put Chevrolet engines in its 1977 Oldsmobiles, and to install in certain 1977 Oldsmobiles transmissions originally designed for Chevettes. Oldsmobile purchasers were told nothing of these changes. The district court certified a nationwide class of individuals "who purchased 1977 Oldsmobile automobiles and who received Oldsmobile automobiles which, without their knowledge or consent, contained V–8 engines manufactured by the Chevrolet Motor Division of General Motors Corporation." The district court then approved a settlement of the class action, an approval which the Seventh

Circuit reversed for reasons not pertinent here. 594 F.2d 1106 (7th Cir.), *cert. denied*, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979). The proposed settlement called for General Motors to provide to each class member $200 in cash, plus a 36-month or 36,000 mile extended warranty on the power train, the latter element in recognition of the claimed inadequacies of the substituted transmissions.

It is obvious that the *Engine Interchange* litigation bears no meaningful resemblance to the case at bar. In *Engine Interchange*, the manufacturer substituted inferior major parts, concealing that substitution from the Oldsmobile purchasers, who remained under the impression that they were purchasing, along with Oldsmobile bodies, Oldsmobile engines and transmissions. That subterfuge either inflicted a legal injury upon all Oldsmobile purchasers or none of them; the decisive questions of fact and law were common to all class members. Furthermore, it was at least arguable as a common question (but see *Skelton, supra*) that economic losses were suffered at the time of purchase by car buyers who paid for Oldsmobiles and received what were, in significant aspects, disguised Chevrolets.

Similarly, in the *Agent Orange* litigation, the herbicide to which the troops serving in Vietnam were exposed, was either offensive in the physical and legal senses or not; and the servicemen and their families either had legal remedies or not. Again, decisive common questions of law and fact predominated, as appears from Judge Pratt's analysis set out in the margin.[12]

In the case at bar, the two decisive questions of fact—the existence *vel non* of "damage in fact," and causation—must be

---

12. The court stated at 506 F.Supp. 787:

"Rule 23(a)(2) states that a class action may only be maintained if 'there are questions of law or fact common to the class.' Here, the action raises numerous questions of law and fact common to the class. Whatever may be the individual questions relating to the manner and extent of each veteran's exposure to Agent Orange, and relating to the particular effects of Agent Orange on the veteran when considered along with his/her medical history, circumstances, lifestyle and other unique

conditions, all of these claims share a common ground when proceeding through the many factual and legal issues relating to the government contract defense, negligence by the defendants, whether Agent Orange was a 'defective product', and the many questions embodied in the concept of 'general causation'. In part, the requirement of commonality is one aimed at determining whether there is a need for combined treatment and a benefit to be derived therefrom. Here the need is compelling, and the benefits are substantial."

decided with respect to each individual Firestone purchaser and each tire. That is sufficient to preclude class certification.

In the light of this holding, I need not discuss at length the other objections to certification made by Firestone. But certain of them raise additional substantial questions. I will deal briefly with two of these: the lack of commonality of questions of law, and the adequacy of the *Feinstein* plaintiffs as representatives of the putative class.

▮ As to questions of law, we have noted that the Magnuson-Moss Act, in respect of claims for breaches of implied warranty, looks to state law for the definition of what an "implied warranty" is. Plain-

tiffs say this causes no difficulty, since U.C.C. §§ 2–314 and 2–714 "are identical in 49 states and provide a uniform legal basis for its resolution." That is an over-simplification; even within the U.C.C. implied warranty umbrella, state law may differ in such significant areas as vertical privity[13] and the availability of punitive damages.[14] In the *Engine Interchange* litigation, Judge McGarr, while certifying a class under Magnuson-Moss, refused to certify a class in respect of implied warranty claims implicating the U.C.C., stating at slip op. 8: "Though the Commercial Code is uniform throughout forty-nine states, each jurisdiction has developed its own interpretation of the Code, thus leading to potentially conflicting legal authorities."[15] The extent to

---

**13.** The question of vertical privity arises because the *Feinstein* plaintiffs (as well as the other plaintiffs) seek to represent classes of owners or purchasers of Firestone tires, whether or not they purchased the tires from Firestone. If a contractual relationship is necessary between plaintiff and defendant to sustain a claim for breach of an implied warranty, those putative class members who did not purchase directly from Firestone have no claim. The laws of the states are not uniform on this issue. See cases cited in Firestone's main brief at 38 n.42. I do not accept plaintiffs' argument that, at least in respect of claims for breach of implied warranty, the Magnuson-Moss Act definitions of "supplier" and "consumer," 15 U.S.C. § 2301(4) and (3), render state law concepts of privity irrelevant; it is the definition section itself which, at § 2301(7), defines "implied warranty" as "arising under State law..." If state law requires vertical privity to enforce an implied warranty and there is none, then, like the yeastless souffle, the warranty does not "arise." This conclusion is reached in Miller & Kanter, *Litigation Under Magnuson-Moss*, 13 U.C.C.L.J. 10, 21 (1980):

"The UCC position on the need for privity in implied warranty cases is apparently not affected by the federal Act. The expansive definition of 'consumer' includes anyone to whom a product is transferred during the implied warranty period. However, the creation and extent of the implied warranty are left up to state law; if the state law holds that privity is essential to the implied warranty right, then probably the implied warranty simply does not survive transfer, and thus there is no one to whom the product is transferred within the implied warranty period. This interpretation is supported by legislative history which uses a privity requirement for implied warranties as an example of a state law on the creation of implied warran-

ties not intended to be altered by the federal Act. In some states, a distant supplier will be held to give an implied warranty to consumers, while in others vertical privity remains a requirement for implied warranty suits."

I do not read *Ventura v. Ford Motor Co.*, 180 N.J.Super. 45, 433 A.2d 801 (N.J.Super.App. Div.1981) or *Hyde v. General Motors Corp.*, No. 21306/80 (Sup.Ct.N.Y.Cty. October, 1981), cited by plaintiffs, as requiring a different result. Cf. *Mendelson v. General Motors Corp.*, 105 Misc.2d 346, 432 N.Y.S.2d 132 (Sup.Ct. Nassau Cty. 1980), which holds that state law vertical privity rules control in implied warranty claims asserted under Magnuson-Moss.

**14.** In that majority of cases where the Firestone tires performed without incident, no claim for punitive damages arises because there was no breach of an implied warranty. See n.9, *supra*, and accompanying text. Even where a defendant's liability is established, the doctrine of punitive damages takes different forms, and requires different showings, in different states. Compare *Toole v. Richardson-Merrell, Inc.*, 251 Cal.App.2d 689, 60 Cal.Rptr. 398 (1961) with *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832 (2d Cir. 1967), where the same defendant's sale of the same cataract-causing drug gave rise to a grant of punitive damages under California law and a denial of punitive damages under New York law. For further indications of a lack of uniformity on punitive damages in U.C.C. cases and elsewhere, see cases cited at Firestone brief 77 n.105.

**15.** Judge McGarr's refusal to certify a class for U.C.C. claims, for the quoted reason, seems somewhat inconsistent with his willingness to certify a Magnuson-Moss class to consider

which the *Feinstein* plaintiffs are prepared to strain in order to achieve class certification is reflected by the suggestion, reply brief at 34, that this Court solve any choice of law problems "by selecting the law of the *one* state which has the most substantial interests with the issues before the court." What state might that be? Plaintiffs suggest Ohio, which in their view, as "the principal place of business of Firestone, has the most significant contacts with this action," reply brief at 34 fn.; Ohio also has the apparent advantage for plaintiffs of allowing punitive damages to be recovered in certain breach of warranty cases. *Ibid.* However, as Firestone correctly points out, this federal court sitting in New York is required, either under Magnuson-Moss jurisdiction or diversity jurisdiction, to look to New York choice-of-law rules. New York follows the "grouping of interests" or "center of gravity" approach in both contract and tort cases, *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963); *George v. Douglas Aircraft Co.*, 332 F.2d 73 (2d Cir.), *cert. denied*, 379 U.S. 904, 85 S.Ct. 193, 13 L.Ed.2d 177 (1964). That requires identifying "the law of the state with the most substantial interest in the issue in question," *Wheeler v. Standard Tool and Manu-*

*facturing Co.*, 359 F.Supp. 298, 301 (S.D.N.Y.1973), *aff'd*, 497 F.2d 897 (2d Cir. 1974). Plaintiffs do not persuade me that Ohio satisfies that requirement in a case involving a tire which was, say, manufactured in Pennsylvania, purchased in Massachusetts, and had its defects manifest themselves in New Jersey.

Secondly, a serious question of adequacy of representation arises when the class representatives profess themselves willing, as they do here, to assert on behalf of the class only such claims as arise from breach of an implied warranty. Plaintiffs' contemplation is that other claims, such as those for death, injury, accident-related property damage, or other consequential damage, may be pursued in other courts. It is fair to say that, during the course of preliminary hearings in this case, plaintiffs so tailored the class claims in an effort to improve the possibility of demonstrating commonality. But that improvement—essentially cosmetic, as the foregoing analysis demonstrates—was purchased at the price of presenting putative class members with significant risks of being told later that they had impermissibly split a single cause of action.[16] Plaintiffs suggest that this

"whether or not defendant General Motors breached a written *or implied* warranty in selling the named plaintiffs an Oldsmobile with a Chevrolet engine," slip op. at 2–3 (emphasis added), since as he then recognized, "if plaintiffs need rely on an implied warranty, a resort to state law for the derivation of such warranty would be necessary." *Id.* at 6 n.3. And *cf. Skelton v. General Motors Corp., supra*, holding that substitution of inferior transmissions did not constitute a breach of implied warranty under U.C.C. § 2–314(2)(c). Notwithstanding this seeming inconsistency in Judge McGarr's analysis, the fundamental difference between the nature of the claims in *Engine Interchange* and the case at bar is apparent. See text at p. 604, supra.

**16.** Such a risk arises with respect to a tire owner whose tire manifested its breach of implied warranty by blowing out and causing an accident which injured the tire owner and damaged his car. It is difficult to imagine many courts sanctioning separate actions for property and injury claims arising out of the same incident. Such a claimant would inevitably face the argument that he "had an obligation in

these circumstances to consolidate into a single proceeding all of his causes of action and to raise in one complaint all the claims which he could reasonably foresee could arise out of the same transaction ... Courts should not permit the splitting of causes of action when the result of doing so could result in vexatious litigation for the defendant and an undue clogging of the dockets of the court." *Ritchie v. Landau*, 475 F.2d 151, 156 n.5 (2d Cir. 1973), citing New York cases; see also *Perkins v. McGuire*, 480 F.Supp. 840, 842 (S.D.N.Y.1979) ("... New York does not permit litigants to split their causes of action," citing *Roe v. Smyth*, 278 N.Y. 364, 16 N.E.2d 366 (1938)). Firestone cites comparable declarations of judicial policy from other jurisdictions. *Rush v. City of Maple Heights*, 167 Ohio St. 221, 147 N.E.2d 599, 607, *cert. denied*, 358 U.S. 814, 79 S.Ct. 21, 3 L.Ed.2d 57 (1958); *Spinelli v. Maxwell*, 430 Pa. 478, 243 A.2d 425, 427 (1968). The sacrifice by a putative class representative of the rights of absent class members implicates due process considerations, *Hansberry v. Lee*, 311 U.S. 32, 45, 61 S.Ct. 115, 119, 85 L.Ed. 22 (1940), as well as the Rule 23(a)(4) require-

problem be dealt with by excluding from the class those tire owners "who have already asserted a claim against Firestone," and by providing in a judgment or settlement of this action that any recovery by a class member must be "conditioned upon his acknowledging in writing the possibility that he may be waiving other rights." Reply brief at 47–48. This is simply another example of the plaintiffs suggesting an awkward and inadequate solution to an inherently insoluble certification problem. But this putative class vessel is so overladen with problems of unfairness and unmanageability that it capsizes and sinks.

Class certification of the *Feinstein* action is denied.

### III.

### *Class Certifications of the Kanter and Jacks Actions*

No extended discussion is required to demonstrate that neither the *Kanter* nor the *Jacks* action may receive class certification. The same obstacles confronting *Fein-* stein apply to *Kanter* and *Jacks*; and those obstacles are compounded by the much broader relief sought on behalf of the putative members of these two classes. Thus the complaint in *Kanter* invokes strict tort liability and fraud theories, in addition to breach of implied warranty, and claims the total of "actual damages sustained" by each member of the class. The *Jacks* action adds to a Magnuson-Moss Act cause of action claims for fraud under the common law and under the laws of all the states of the union, and demands recovery for "actual and consequential damages incurred" by every class member. It is precisely this breadth of claim and invocation of differing laws which prompted Judge McGarr in the *Engine Interchange* litigation to deny class certification to all claims except for breach of an express warranty under Magnuson-Moss.[17] Judge Bryan of the Eastern District of Virginia reached the same conclusion in denying class certification in *Farris v. Firestone Tire & Rubber Co., Inc.*, Civ. No. 78–711–A (E.D.Va. March 9, 1979).[18]

ment of "adequate representation." *Cf. Augusta v. Marshall Motor Co.*, 453 F.Supp. 912, 919 (N.D.Ohio 1977), *aff'd*, 614 F.2d 1085 (6th Cir. 1979). Comparable concerns clearly troubled Judge Campilongo in *Allshouse v. Firestone Tire and Rubber Co.*, No. 742–649 (Cal.Superior Ct., S.F.Cty., August 28, 1981), in which the court denied class certification to an action commenced by purchasers of the same Firestone tires as are involved in the case at bar: "There exist substantial factual questions whether the individual plaintiffs' claims are truly representative of those of the putative class members. A related and more important question arises from the class representatives' last minute abandonment of several legal theories. While these problems do not reflect the capability of plaintiffs' attorneys, they are a reflection of the underlying obstacles to treating this controversy through the class action mechanism." Slip op. at 3.

17. As noted at p. 17 *supra*, Judge McGarr denied class certification in respect of U.C.C. claims because of the differing interpretations of the Code throughout the several states. His opinion also states: "Furthermore, the other state claims for fraud and misrepresentation also present the specter of a multiplicity of legal determinations, as well as the individual factual determinations attendant to these claims." Slip op. at 8.

18. *Farris* and *Allshouse*, n.16 *supra*, are the only two cases cited by counsel or known to the Court in which owners or purchasers of the Firestone tires in suit sought class certification. Both cases denied certification. In *Farris*, Judge Bryan dismissed the Magnuson-Moss claim because of an insufficiency of claimants; he did not reach the merits issues upon which this opinion is based. As for the other claims sought to be asserted by the individual plaintiffs in *Farris*, the court expressed its unwillingness "to consolidate into one suit what amounts to twelve separate claims for damages on a number of theories. Particularly does this seem apposite to the one theory most likely to support a punitive damage award, namely, fraud. The claims of each plaintiff are, under these circumstances, more appropriately asserted in separate suits." Slip op. at 3.

In *Allshouse*, the court was "unable to discern that *any* substantial issue under any of plaintiffs' theories of recovery is susceptible of common proof"; that failure of commonality included plaintiffs' failure to "establish that it is possible to prove, by common evidence, that each class member has sustained damage. A fortiori, the questions of measuring damages is shrouded in obscurity." The court continued:

"Where, as here, the class excludes the most severely injured—those who sustained personal injuries—and where those less severely injured have been offered an array of volun-

### IV.

While I recognize the general remedial purposes of Rule 23 and the class action provisions of the Magnuson-Moss Warranty Act, they can be relied upon by litigants, and administered by the courts, only in accordance with their terms and conditions, and in circumstances where the furtherance of justice is promoted, not hindered. In the cases at bar, those terms and conditions have not and cannot be met, and those circumstances are not present. To certify any of these actions as class actions would be to unleash a Frankenstein monster of unmanageability, weighted down with individual questions of fact and law which clearly predominate, to the potential disadvantage of the litigants, and to the certain prejudice of the orderly disposition of such enforceable legal claims as may arise from the public's ownership and use of Firestone tires.

The motions for class certification are denied.

It is So Ordered.

tary private remedies by defendant, this Court cannot conclude that the class action mechanism would be a superior means of resolving the instant controversy and affording redress to the class. Indeed, such a device in this case might actually deter manufacturers from undertaking voluntary remedial steps in the future, because they may perceive that they will in effect be subjected to multiple liability. Such a result would be contrary to the interests of consumers generally." Slip op. at 1–3 (emphasis in original). As indicated in the discussion *supra*, I share these concerns, and join these courts in regarding class certification as inappropriate to the Firestone litigation.